# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**KURT VROMAN,**

**Plaintiff,**

**-vs-**                                                  **Case No.  6:06-cv-229-Orl-28DAB**

**VOLUSIA COUNTY, FLORIDA, JAMES TAUBER, TERRY MOORE, JAMES WILLITS,**

**Defendants.**

_____

## ORDER

On February 23, 2006, Plaintiff filed the instant Complaint, raising claims of retaliation for his speech and for his union activity pursuant to 42 U.S.C. § 1983. (Compl., Doc. 1.) This cause is before the Court on Defendants' Motion for Summary Judgment (Doc. 79) and Plaintiff's Memorandum in Opposition (Doc. 114).  Because numerous disputed issues of material fact remain to be tried, Defendants' Motion for Summary Judgment must be denied.

### I. Background[1]

Plaintiff Kurt Vroman ("Plaintiff") was Vice President of the local firefighters' union and a probationary[2] lieutenant in the Volusia County Fire Department.  (Vroman Decl. ¶ 1.)  He

---

[1] The facts and all reasonable inferences are construed in the light most favorable to Plaintiff, the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

[2] Plaintiff worked for the Volusia County Fire Services for six years and was promoted to lieutenant in September 2003.  (Vroman Decl. ¶ 1.)  All personnel go through a six-month probationary period after they are promoted to a higher rank.  On March 16, 2004, Plaintiff was still on probation.

was terminated on May 20, 2004 purportedly for events that occurred on March 16, 2004 –

four days after the union effected a vote of no confidence against the individual Defendants

– Chief James Tauber, Director Terry Moore, and Deputy Director James Willits. (Vroman

Decl. ¶ 1; Vroman Dep. at 36-37, 39, Apr. 30, 2007.)

By early 2004, communications had broken down between the union leadership and

upper management.  (Plummer Dep. at 20-22, June 21, 2007; Tauber Dep. at 51-53, June

19, 2007; Lary Dep. at 14-16, 37-39, 41, July 31, 2007.)   The President of the union,

Jeremiah Greathouse ("Greathouse"), was perhaps most vocal in his criticisms of the

department, but Plaintiff was also outspoken on the union's behalf.  (See Ward Dep. at 14-

15, 26-27, 31, 32, Dec. 8, 2006; Vroman Dep. at 162, 165-66, 216-18; Vroman Decl. ¶¶ 5

& 6; Brasol Dep. at 59, 60, 62, May 4, 2007; Greathouse Dep. at 40-42, 56-59 Dec. 7, 2006;

Hughes Dep. at 51; McMillen Dep. at 39-40, June 20, 2007.)  Plaintiff had testified during the

arbitration of an unfair labor practices charge against the County (Vroman Dep. at 117), and

he was known or believed to have precipitated the confidence vote.  (Ward Dep. at 31-32;

Brasol Dep. at 124-25, 131, 132; Vroman Dep. at 218; Vroman Decl. ¶ 7; Castelli Dep. at 20-

21, 22; Frazier Dep. at 37, June 28, 2007.)

Meeting notices announcing the vote of confidence in Chief Tauber, Director Moore,

and Deputy Director Willits were hung on union bulletin boards in the fire stations throughout

the County.  (Defs.' Ex. 3.)  Director Moore and Deputy Director Willits saw one, removed

it, and contacted Chief Tauber to ask if he had preapproved it in accordance with the

collective bargaining agreement. (Vroman Dep. at 225-26; Willits Dep. at 124-29; Moore

Dep. at 55-60, May 2, 2007; Tauber Dep. at 27-29.)  Chief Tauber had the notices removed

and he contacted the personnel director about the fact that they had been posted. (Tauber Dep. at 29, 87-88; Lary Dep. at 33-34, 36.)  Chief Tauber had never before contacted the personnel director about unauthorized postings and he did not normally police the boards. (Tauber Dep. at 30, 84, 85-86.)  He did, however, remove things from time to time that were inappropriate.  (Id. at 84-85.)

On March 11 and 12, 2004, the union voted overwhelming that it had no confidence in Chief Tauber, Deputy Director Willits, or Director Moore, even after turning away about fifteen probationary firefighters who were advised not to vote by union leadership because of the fear that they would be retaliated against.  (Vroman Dep. at 223.)  The individual Defendants did not attend the union meeting, but rumors and gossip spread regularly throughout the Department, and there is evidence that Defendants knew of the meeting, knew the composition of the union leadership, and knew the outcome of the vote.  (Plummer Dep. at 65, 94; Pocica Dep. at 26; Tauber Dep. at 27, 30-31, 32-34, 40-41; Vroman Dep. at 158-59; Vroman Decl. ¶ 8; Willits Dep. at 123; Castelli Dep. at 19-20; Lary Dep. at 47-48; McMillen Dep. at 107-09.)  Deputy Fire Chief Plummer ("Plummer") characterized the vote of no confidence as "common knowledge" and "the buzz of the department" (Plummer Dep. at 38-39), and the local press covered it.  (Id. at 65; Willits Dep. at 167; Moore Dep. at 79-80; Pl.'s Exs. 51 & 52.)  Immediately after the vote, two people went around to the stations asking the employees to sign a petition of support for the individual Defendants.  (Pocica Dep. at 22; Tauber Dep. at 96, 99; Vroman Decl. ¶ 10; McMillen Dep. at 57-59; Moore Dep. 90-93; Pl.'s Exs. 14, 15 & 16.)

On March 15, 2004, the first business day after the vote was taken, Greathouse was

disciplined for posting the meeting notice without first obtaining approval and because the notice was deemed controversial.  (Greathouse Decl. ¶ 2; Tauber Dep. at 88-89; Vroman Decl. ¶ 9; Defs.' Ex. 18 at VR0000000003-04.)  It was the first time he was disciplined for posting notices of a union meeting on the boards (Greathouse Decl. ¶ 2), which, he says, in past practice did not need preapproval despite a provision in the collective bargaining agreement requiring preapproval of all postings.  (Greathouse Dep. at 18-24; see also Defs.' Ex. 18 at VR0000000011.)  Greathouse filed a grievance, and the letter of reprimand was removed from his personnel file.  (Tauber Dep. at 41-42, 220; Vroman Dep. at 171; Greathouse Dep. at 22-23.)

On March 16, 2004 – Plaintiff's first shift after the vote of no confidence – Chief Tauber and Deputy Chief Pocica conducted an unannounced "ride-along" at Station 13, where Plaintiff was scheduled to work along with two other union leaders – Greathouse and Secretary-Treasurer Justin Hughes ("Hughes").[3]  (Greathouse Decl. ¶ 6; Vroman Decl. ¶ 11.)  Chief Tauber, Deputy Chief Pocica, Deputy Chief Weaver, and Deputy Chief Plummer had conducted a ride-along at Station 35 in January, the first in a planned series of ride-alongs at certain stations intended to increase morale among the firefighters and open lines of communication.[4]  (Plummer Dep. at 86-88; Pocica Dep. at 28-29, 32-33, 36; Tauber Dep.

---

[3] Plaintiff arrived at about noon because he had a doctor's appointment that morning. (Vroman Decl. ¶ 11.)  Greathouse left when Plaintiff came on shift.  (Id. ¶ 14.)

[4] Just before the Station 13 ride-along, Deputy Chief Pocica called Chief Tauber to find out if they were still riding with Station 13 because neither Deputy Chief Weaver nor Deputy Chief Plummer was able to attend that day; Chief Tauber affirmed that they would still visit Station 13.  (Pocica Dep. at 37.)  The two men also discussed then that Plaintiff was the officer in charge on March 16, 2004.  (Id. at 38-39.)

at 122-24.)  Deputy Chief Pocica denies knowing of the vote during the ride-along.  Later, he said he felt the vote hurt the department and he knew Chief Tauber was upset by it. (Pocica at 16-17, 19-20, 21, 24.)  Chief Tauber knew, however, that the vote had just taken place at the time of the ride-along.  (Tauber Dep. at 27, 39.)

During the ride-along, Chief Tauber and Deputy Chief Pocica worked with the men of Station 13.  (Pocica Dep. at 47-50.  But see Hughes Dep. at 53-54 (characterizing their actions as watching and following them).)  That afternoon, Chief Tauber and Deputy Chief Pocica went to the maintenance barn to retrieve Engine 13, which had been in for repair. (Pocica Dep. at 52, 55; Vroman Decl. ¶ 14.)  Deputy Chief Pocica reports that when he and Chief Tauber returned to the station, Chief Tauber stated that the engine drove like a hog, suggesting it was out of water.  (Pocica Dep. at 61, 65; Tauber Dep. at 126-28, 132.)  The Chiefs did not refill the water tank, which is one of the things about which Plaintiff is suspicious.  (Pocica Dep. at 68; Vroman Dep. at 186-87; Vroman Decl. ¶ 15; Greathouse Decl. ¶ 4; Hughes Dep. at 52, 96; Hughes Decl. ¶¶ 2 & 3; see also Frazier Dep. at 65.) Deputy Chief Pocica claims he told Plaintiff to check the gas and that the water was empty, but this is disputed by Plaintiff and Hughes, who have stated that they would have filled the water tank just outside of the station had they known it was empty. (Pocica Dep. at 67, 68, 86; Vroman Dep. at 68; Vroman Decl. ¶¶ 16, 20, & 30; Hughes Decl. ¶¶ 3 & 4.)

Just before 6:00 p.m., Plaintiff and Hughes took Engine 13 in service[5] for fuel and

_____

[5] There is apparently more than one definition of "in service."  An engine can be "in service," meaning that it is equipped, ready, and able to respond to emergency calls.  The engine can also be taken "in service," or put on the road, for a particular purpose, such as obtaining fuel or water.  An engine in service for a particular purpose may or may not be in

while driving they realized the engine was out of water.  (Hughes Decl. ¶ 4; Vroman Dep. at 68; Hughes Dep. at 63-64; Vroman Decl. ¶¶ 17, 20, & 30.)  The men considered obtaining water their first priority, so they drove to a hydrant located on a road that runs between a Race Trac and a Shell gas station.  (Vroman Dep. at 69, 75-76; Vroman Decl. ¶ 21.)  While filling, Captain Castelli, a probationary Battalion Commander,[6] called the men from the training center where he was teaching a hazmat class.  (Vroman Dep. at 77; see also Plummer Dep. at 83.)  He wanted to know Engine 13's location.  (Vroman Dep. at 73, 77; Vroman Decl. ¶ 24; Hughes Dep. at 66-67.)  Plaintiff said they were in service for fuel and that they were in the vicinity of the Race Trac gas station.[7]  (See Vroman Dep. at 84.)

After filling the water tank at the hydrant, the men crossed the Shell station's parking lot, went into Saddle Jack's restaurant, and placed a food order.  (Id. at 75.)  While waiting, Captain Castelli called and talked to Plaintiff at least two more times, asking for Engine 13's location.[8]  (Vroman Dep. at 76-77; Castelli Dep. 96.)  Unsatisfied, Captain Castelli ordered

_____

service for responding to calls.

[6] Captain Castelli was in his six-month probationary period as a Battalion Commander.

[7] It is apparently standard procedure for firefighters to report their location by giving general vicinities, landmarks, and crossroads. (Hughes Dep. at 59, 77-78, 82; Hughes Decl. ¶ 5; Ward Dep. at 37-39; Brasol Dep. at 98-100, 102-02, 105, 108, 117; Vroman Decl. ¶ 25; Creech Dep. at 31-32, Dec. 7, 2006; Greathouse Dep. at 83, 104; cf. Plummer Dep. at 53 (indicating that a specific location is expected).)

[8] Firefighters do not normally announce or report when they are getting food, it is just picked up while out on a call.  (Brasol Dep. at 114-16; Creech Dep. at 33; Hughes Dep. at 77.)  Firefighter Hughes also averred that it is standard procedure to state that a fire engine is "in service for fuel" if that was the original purpose for taking the engine out.  (Hughes Decl. ¶ 6; Vroman Decl. ¶ 19 ("When a fire engine leaves a station and goes in service, it is common practice for a fire[]fighter to announce only one purpose for the trip [to keep radio

Plaintiff and Hughes to return to the station and call him on a land line before they were able to obtain fuel, the purpose for which they were originally in service. (Vroman Dep. at 49-51, 69, 73, 76-78, 83; Vroman Decl. ¶ 26; Castelli Dep. at 97; Hughes Dep. at 83-84.)  On the land line call, Captain Castelli asked whether the fuel receipts would coincide with the times at which Plaintiff said he was at the Race Trac.  (Castelli Dep. at 97.) Plaintiff said he and Hughes had picked up an order at Saddle Jack's and that it took longer than expected. (Vroman Dep. at 76.)  Captain Castelli asked if they sat down at the restaurant; Plaintiff responded that they did sit down but did not dine there.  (Id. at 84-85; Vroman Decl. ¶¶ 27 & 29.)  Plaintiff and Hughes went in service again, returning the reserve truck to Station 14, fueling Engine 13 at the Handy Way gas station at 7:54 p.m., and returning at 8:00.[9] (Vroman Dep. at 87-89; Vroman Decl. ¶ 28; Hughes Dep. at 64-65, 86-89.)

Although it is disputed, Plaintiff said that he told Captain Castelli that he was next to the Race Trac gas station when he was asked for his location.  (Vroman Decl. ¶ 24; Castelli Dep. at 96 ("He told me that he was at the – near or at the Race Trac gas station getting fuel, and that's not where he was at.").)  Most firefighters who were deposed were aware that neither the Race Trac nor the Shell gas station carries diesel fuel – the type that the fire

---

communications at a minimum]."); see also McMillen Dep. at 92-93.)

[9] The document detailing the basis of Plaintiff's dismissal, titled the Notice of Intent to Dismiss, emphasizes the length of time Engine 13 was in service to obtain fuel because the engine went in service at 5:54 p.m. and did not return until 8:01.  (Defs.' Ex. 29.)  This description is misleading, however, because from 5:54 p.m. until 8:01 p.m., Plaintiff and Hughes went in service for fuel; detoured to fill the engine with water; stopped to pick up food; returned to quarters to call Captain Castelli and waited for his return call; obtained Rescue 14 and returned it to Station 14; and got fuel at 7:54 before returning at 8:01 p.m.

engines require – and so it is at least doubtful that Plaintiff stated he was "still refueling at the Race Trac gas station," as Captain Castelli reported, as opposed to stating that he was in service for fuel.  (See Vroman Dep. at 86; Vroman Decl. ¶ 22; Hughes Dep. at 69-70; Defs.' Ex. 32.)  Plaintiff claims he told the truth to all questions as they were asked (Vroman Dep. at 48, 97; Vroman Decl. ¶ 31), and that he was never asked for his specific location.

Plaintiff feels that he was set up and targeted on March 16, 2004.  (Vroman Dep. at 192, 199-200; see also Hughes Dep. at 73-74.)  It was unusual for a superior officer to call numerous times inquiring about an engine's location.  (See Brasol Dep. at 100; Hughes Dep. at 73-74, 79-81.)  There is no evidence that Captain Castelli asked Plaintiff point-blank if he was at a restaurant, which was his suspicion.  (Castelli Dep. at 96.)  Captain Castelli reports that Plaintiff admitted being dishonest, but Plaintiff denies this.  (Id. at 42-43. But see Vroman Decl. ¶ 31 (denying that he ever admitted being dishonest).)  As for the discipline, Captain Castelli states that the incident "was more of the 'dining out' policy was what led to the write-up, but the initial write-up was for being untruthful with me."  (Castelli Dep. at 17.)

The next day, Captain Castelli was advised to write a report.  He drafted multiple versions that were edited by Deputy Chief Plummer.  (Plummer Dep. at 55, 61-62; Vroman Dep. at 100; Castelli Dep. 17-18, 39-40, 47-48.)  During the pendency of his discipline, Plaintiff's probationary period was extended and the mandatory evaluation report due at the expiration of his probation was untimely.[10]  (Vroman Decl. ¶ 37.)  Both Plaintiff and Hughes

---

[10] On April 8, 2004, Plaintiff received a performance evaluation that had been completed on March 23, 2004.  (Defs.' Ex. 24.)  The evaluation's comments focus on initiative-taking and decisionmaking.  (Id.)  Presumably referencing the incident of March 16, 2004, the reviewer wrote, "Recently, he made a decision that was in direct violation of

were transferred following the incident.  (Id. ¶ 38; Hughes Dep. at 148-49.)  Chief Tauber,

Director Moore, and Deputy Director Willits decided Plaintiff should be terminated because

this was his second offense of making false statements to his superiors.[11]  On April 20, 2004,

Plaintiff was issued a Notice of Intent to Dismiss for violating the Volusia County Fire

Services Dining Out Policy 105.003 and the Inter-Department Memorandum OP-03-0513[12];

Department Standard Operating Guideline 102.001; General Rules sections 100.001,

100.002, 100. 003, 100.012, 100.040, 100.051, and 100.054; and the Code of Conduct

_____

Department policy."  (Id.)  The report does not mention his alleged false statements to
supervisors, but rather states, "Lt. Vroman has the ability to be an excellent officer, however
lack of initiative and poor judgement do not build confidence or trust, and are two areas that
are not acceptible [sic] for an up and coming leader.  It is recommended that Lt. Vroman's
probation be extended to allow additional time for improvement and further performance
assessment."  (Id.)

      [11] In 1999, Plaintiff had an accident while backing up an engine.  (Tauber Dep. at 204-
05.)  In the incident report, he stated that he followed all policies and procedures before
backing up the engine, but another firefighter later said that Plaintiff did not do a walk-
around.  (Id.)  Upon being told that he would be terminated if he did not amend his incident
report, Plaintiff deleted the sentence saying he did the walk-around, but he still claims that
he did not make any false statements in 1999 or in 2004 and he believes that he did do the
required walk-around.  (Vroman Dep. at 55-59.)  Plaintiff was then disciplined for making a
false statement in his report.  (Tauber Dep. at 207; Lary Dep. at 71-73.)

      [12] Inter-Department Memorandum OP-03-0513 was not actually in effect on March 16,
2004 and neither was Policy 105.003.  (See Defs.' Ex. 28, Inter-Department Memorandum
OP-03-0514 (suspending 105.003 dining-out privileges and superceding OP-03-0513).)
Memorandum OP-03-0514 permitted firefighters to pick up groceries or carry-out food only
when returning from a call or assignment.  (Id.; see also Plummer Dep. at 33-38; Castelli
Dep. at 47.)  Food stops were to be ten minutes or less in duration. (Defs.' Ex. 28.)
      Plaintiff admits he exceeded the ten-minute rule on March 16, in part because the
food orders eventually arrived on plates instead of in carry-out containers.  (Vroman Dep.
at 76, 85, 94-95, 97; Vroman Decl. ¶ 23.)  There is some dispute, however, as to whether
the memo applied to Station 13 because the station's kitchen was under construction.
(Vroman Dep. at 94-95; Vroman Decl. ¶ 18; Castelli Dep. at 29; see also Plummer Dep. at
41.)

section 86-45.  (Defs.' Ex. 29, Notice of Intent to Dismiss, Apr. 20, 2004.)

Although Captain Castelli denies it (Castelli Dep. at 102), at least three firefighters report that he told them he felt pressured to turn in a statement about Plaintiff, that he did not want to do it, that he was apologetic, and that in his opinion the punishment did not fit the "crime." (Vroman Dep. at 99, 189; Vroman Decl. ¶ 32; Greathouse Dep. at 67-68, 71; Ward Dep. at 60-61; Hughes Dep. at 105.)  Another firefighter reported that Captain Castelli once made false accusations against him and that the firefighter had to call in witnesses to clear his name.  (Rudnicki Dep. at 17-19, 21-22, June 20, 2007.)  Yet another lieutenant reported that Captain Castelli "has no problem stepping on other people to advance his own career." (McMillen Dep. at 22.)  Plaintiff said that just before the vote of no confidence, Captain Castelli asked Plaintiff if he was sure he wanted to go through with the vote and whether he was sure the vote was a good idea.  (Vroman Dep. at 164.)

Later in 2004, Chief Tauber presented an award to Captain Castelli at a banquet.  In his speech about Captain Castelli, Chief Tauber referenced Plaintiff's termination, stating that Captain Castelli was treated horrendously and had been retaliated against for his role in Plaintiff's dismissal.  (Tauber Dep. at 150-53.)  Chief Tauber says that Captain Castelli was not rewarded for writing the report about Plaintiff.  (Id.)

On April 14, before the decision to terminate Plaintiff was made, approximately 50 applauding and cheering firefighters attended a county council meeting where Greathouse discussed the vote of no confidence, with Plaintiff standing next to him.  (Frazier Dep. at 31-32; Greathouse Dep. at 28; Vroman Dep. at 160; Vroman Decl. ¶ 39.)  Chief Tauber listened to the meeting, and felt the vote was unfair and based on invalid reasoning, and it annoyed

him. (Tauber Dep. at 30-31, 36.) Chief Tauber also felt that the representations at the council meeting – which is open to the public and broadcast over the internet – were pointed and accusatory, and he "didn't care for it." (Id. at 36-37.) Chief Tauber was further concerned about the response of the public. (Id. at 37.)

On May 20, 2004, Plaintiff was terminated. Plaintiff grieved his termination, but his grievance was denied. (Defs.' Exs. 31, 33, 35, & 36-40.) Plaintiff then demanded arbitration. (Defs.' Ex. 40.) While the review of Plaintiff's termination was pending, Chief Tauber spoke at the graduation ceremony at the Lieutenant's Academy, and stated that he supported Captain Castelli 110% and that Plaintiff would not get his job back regardless of the outcome of his appeal. (Rudnicki Dep. at 31.) Another graduate remembers Chief Tauber discussing loyalty and not being a whiner; then Chief Tauber discussed Plaintiff and said he did not care what the arbitrator said and that he believed Captain Castelli. (McMillen Dep. at 25-26.) Chief Tauber does not remember discussing Plaintiff at the graduation. (Tauber Dep. at 147.) Plaintiff's arbitration was dismissed in 2005 as "not arbitrable" because it was procedurally defective. (Vroman Dep. at 132; Vroman Decl. ¶ 46.)

## II. Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). "A nonmoving party, opposing a motion for summary judgment supported by affidavits [or other relevant evidence] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e) (providing that the nonmovant "must set forth specific facts showing that there is a genuine issue for trial").

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. Some degree of factual dispute is expected, but to defeat a motion for summary judgment the factual dispute must be material and genuine. That is, the factual evidence must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

### III. Analysis

Plaintiff claims he was terminated in violation of his rights as guaranteed by the First Amendment for exercising free speech and free association. Defendants argue that Plaintiff's speech was not protected because it was not on a matter of public concern; that there was no causal link between Plaintiff's speech and his termination and thus no

retaliation; and that they are shielded by qualified immunity.

A. Retaliation Claims

Employers have, in some instances, an interest in restricting the speech and associative conduct of their employees. That is, government employees have some but not an absolute right to the protection of their speech or conduct. First Amendment retaliatory discharge claims are analyzed under the test articulated in Bryson v. City of Waycross, 888 F.2d 1562 (11th Cir. 1989). "The Bryson test examines (1) whether the employee's speech involves a matter of public concern, (2) whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service, (3) whether the speech played a substantial part in the government's challenged employment decision, and (4) whether the government would have made the same employment decision in the absence of the protected conduct." Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1563-64 (11th Cir. 1995); see also Stanley v. City of Dalton, 219 F.3d 1280, 1288 (11th Cir. 2000). The first two prongs are questions of law regarding whether the speech is protected. Beckwith, 58 F.3d at 1564. The two remaining prongs are questions of fact "designed to determine whether a retaliatory motive was the legal cause of the challenged employment decision." Id.

The test is similar for claims of retaliation for union activity. See Hitt v. Connell, 301 F.3d 240, 246 (5th Cir. 2002) (applying similar framework to claim of retaliation for union activity except that adverse employment action replaces the step requiring speech on a matter of public concern); Douglas v. DeKalb County, No. 1:06-cv-0584, 2007 WL 4373970, at *3 (N.D. Ga. Dec. 11, 2007) (same). According to Eleventh Circuit precedent, however,

free association claims based on union activity need not meet the public concern element.

Cook v. Gwinnett County Sch. Bd., 414 F.3d 1313, 1320 (11th Cir. 2005).

    *1. Public Concern*

    For speech "'[t]o involve a matter of public concern, a government employee's speech must 'relat[e] to any matter of political, social, or other concern to the community.'" Stanley, 219 F.3d at 1289 n.13.   Determined based on the "content, form, and context" of a statement, matters of public concern are distinct from matters of personal interest about which one speaks as a citizen or an employee.   Id.   There is no merit to Defendants' contention that Plaintiff's speech was purely personal and wage-related.[13]   Plaintiff's speech pertained to the safety and efficacy of the Volusia County Fire Services; the understaffing that required mandatory overtime; the collective bargaining agreement; and the County budget allocations – all of which are squarely issues of public concern.   See Beckwith, 58 F.3d 1564 ("Few subjects are of more public concern to the average citizen than the

---

[13] In the "public concern" section of Defendants' motion, Defendants argue that no other union members were disciplined for their outspokenness. (Doc. 79 at 13.)  The Court is unsure of the connection between this argument and the determination of whether Plaintiff's speech and union activities touched on matters of public concern.   If, hypothetically, Defendants singled out a union leader to punish based on the vote of no confidence, it is irrelevant that Plaintiff was the only one disciplined.

    Also shy of the relevancy mark is Defendants' argument that Plaintiff has no "similarly-situated comparator" and that there was no "disparate treatment" between Plaintiff and other employees who were dishonest.   While evidence of disparate treatment – a Title VII framework – could support Plaintiff's argument that the stated reason for his termination was pretextual, the absence of a "similarly-situated comparator" does not undermine Plaintiff's retaliatory termination claims.   Defendants' contention that Plaintiff "fails to meet the threshold requirements for a disparate treatment claim" is of no moment because Plaintiff has not raised a claim of disparate treatment.

provision of basic fire and rescue services.  It is hard to imagine any combination of government interests sufficient to outweigh [the plaintiff's] strong interest in informing the public about policies he believed were dangerous to the City's citizens.")

> *2.* Pickering *Balancing*

The second prong is the progeny of Pickering v. Board of Education, 391 U.S. 563, 572-73 (1968), which asks whether the plaintiff's interest in speaking out or engaging in union activity outweighs the government's interest in promoting the efficiency of the public services it provides or in securing the proper performance of an employee's daily duties.  Id. Defendants do not argue that their interest in promoting the efficiency of the Volusia County Fire Services outweighs Plaintiff's interest in speaking or in urging the vote of no confidence. See Tatroe v. Cobb County, No. 1:04-cv-1074, 2006 WL 559437, at *15 (N.D. Ga. Mar. 7, 2006) (indicating that the Pickering balancing test does not apply when the employer claims the adverse employment action was unrelated to the plaintiff's speech).  Defendants claim they did not know of Plaintiff's speech or his role in the vote and that Plaintiff's termination was not based on those protected activities.  There is no evidence that Plaintiff's speech or union activity or even the vote of no confidence resulted in disruption to the provision of fire services.  Plaintiff's interest in speaking and organizing union activity was not overridden by Defendants' interests in maintaining order.

> *3. Causation*

The third prong asks whether the speech or union activity played a substantial part in the government's challenged employment decision.  "[T]he plaintiff's burden in this regard is not a heavy one."  Stanley, 219 F.3d at 1291.  In determining whether Plaintiff has

presented sufficient evidence to try his case to a jury, courts consider: (1) the temporal proximity between the protected activity and the termination; (2) whether any asserted reasons for the termination were pretextual; (3) whether any comments were made, or actions taken, suggesting that the termination was related to the speech or activity; (4) whether the stated reasons for the termination varied; (5) who initiated the investigations or termination proceedings; (6) whether there was evidence of management hostility to the speech; and (7) whether the employer had a motive to retaliate. Id. at 1291 n.20.  Plaintiff has sufficiently raised an issue of material fact as to whether his termination was motivated by his participation in the vote of no confidence to put the question to a jury.

Causation may be inferred based on the temporal proximity – here, four days – between the protected activity and the adverse employment action.  Id. at 1291 & n.20; Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 745 (11th Cir. 1996).  There is evidence that Defendants knew Plaintiff was a leader in the union and knew of the vote of no confidence before it occurred.  Defendants had motive to retaliate against Plaintiff.  Evidence of anti-union animus is also relevant in determining whether Plaintiff's speech and union activity played a substantial role in his termination.[14]

---

[14] Firefighters report an undercurrent of anti-union sentiment in the department.  When John Rudnicki was hired, Chief Tauber told him that others in the department looked down on being in the union and that joining could harm his chances of getting off of probation. (Rudnicki Dep. at 9.)  Firefighter Michael McMillen was also pressured not to join the union when he was hired.  (McMillen Dep. at 11.)  Plaintiff states that Director Moore and Deputy Director Willits are well-known to be anti-union, (Vroman Dep. at 164), and Deputy Director Willits admits taking an anti-union position publicly (Willits Dep. at 40-41).  He also drafted a letter that he sent to all employees, discouraging them from unionizing.  (Id. at 42-115; Vroman Dep. at 177; Brasol Dep. at 18.)  Deputy Director Willits wrote that forming a union would "bog down" the department and "tie the hands" of Chief Tauber.  (Willits Dep. at 112.)

Additionally, although there is evidence that the March 16th ride-along was planned in advance of the vote, there is also evidence that it was an unusual event and that it was not rescheduled even though two of the chiefs had other commitments.  Three union leaders were working at the chosen station and shift.  A jury could believe that Chief Tauber visited Station 13 with the aim of finding something for which to discipline any of the union leaders.

Also disputed is whether the stated reasons for Plaintiff's termination were pretextual. Plaintiff admits violating the "ten-minute" rule of the dining-out policy, but that violation was not a terminable offense.  It has been contended that the policy did not even apply to Station 13 at the time because Station 13 did not have operable kitchen facilities.  Moreover, Captain Castelli's zealousness in tracking down the location of Engine 13 was unusual, and it was particularly so given the fact that he was teaching a class at the training center.  Further evidence is that Plaintiff's responses to Castelli's questions were in accordance with the standard practice – that is, to state the original reason for going in service and to give a location in general, not specific, terms.  There is no evidence that Plaintiff was ever asked directly whether he was in a restaurant, even though Captain Castelli was clearly seeking

---

There were rumors that Chief Tauber was involved in union busting; Chief Tauber went to the union website several times to read the articles, see what the issues were, and to look for information accusing him of union busting.  (Tauber Dep. at 80-81, 83.)  Plaintiff remembers Chief Tauber saying that unions can do good and bad and that Cynthia Coto, the county manager, did not like unions.  (Vroman Dep. at 176-77.)  When the union was forming, Chief Mauney advised firefighter Mike Brasol that unionizing was not a good idea. (Brasol Dep. at 16-17.)  Brasol testified that rumors discouraged people from joining the union.  (Id. at 18.)  Hughes reports feeling that there would be retribution for anything said regarding union activity or any criticism of management, whether by being transferred to another station or having a "thumb" put on the speaker.  (Hughes Dep. at 146-47.)  Unfair labor practices are also evidence of anti-union sentiment.

that information.  It is possible that Plaintiff was singled out and targeted and that Plaintiff was honest with Captain Castelli on March 16, 2004.

Chief Tauber discussed Plaintiff's termination in a speech about loyalty and also while presenting an award to Castelli.  Just before the vote of no confidence, Director Moore and Deputy Director Willits removed a meeting notice announcing the vote because it was not preapproved; Greathouse was subsequently disciplined for posting the notice.  There is evidence, however, that union meeting notices did not need to be pre-approved and that no one has been disciplined in the past or since for posting unapproved materials.  After Greathouse grieved his discipline, the reprimand was rescinded.

There is also evidence that Captain Castelli's report was edited and that the emphasis by management has vacillated between the violation of the dining-out policy and allegations of dishonesty.  In an evaluation of Plaintiff, only a violation of department policy is referenced – presumably, violation of the dining-out policy.  There is no mention of false statements to supervisors as undermining the trust and confidence placed in him; rather, his failure to take initiative and his judgment were cited with that effect.  Chief Tauber seems to have initiated much of the discipline directed at union leaders, asking the personnel director if he could discipline Greathouse for posting the notices and if he could terminate Plaintiff for a second allegation of dishonesty.  The investigation into the incident appears to have consisted of a follow-up phone call by Captain Castelli 16 and little more.  Hughes was never interviewed. (Hughes Dep. at 150.)  A jury could believe that Plaintiff's violation of the dining-out policy was the true basis of the discipline he received and that the allegations of false statements were used to justify – pretextually – his termination for a non-terminable offense.

### 4. "But For" Test

The last prong consists of the defense that Plaintiff would have been terminated even if he had not spoken critically of the upper management and precipitated the vote of no confidence.  To establish this same-decision defense, "a government employer must show that the legitimate reason would have motivated it to make the same employment decision." Stanley, 219 F.3d at 1293.  Given that there is a disputed question of fact as to whether Defendants' stated reasons for Plaintiff's termination were pretextual, Defendants have not met their burden in establishing this defense.  Although this conclusion is not warranted simply because there is a fact issue at the third prong of the Bryson test, see Stanley, 219 F.3d at 1292, a question as to whether Defendants had a legitimate reason for terminating Plaintiff at all requires denying summary judgment on this ground.  See Pattee v. Ga. Ports Auth., 477 F. Supp. 2d 1253, 1266 (S.D. Ga. 2006) ("[I]t is possible that defendants did not believe [the plaintiff] lied, but believed they could label the exchange at the interview a lie and use it as pretext to fire him.").  Even if Plaintiff was dishonest with Castelli on March 16, 2004, the Court cannot conclude as a matter of law that Defendants would have taken the same action against Plaintiff were it not for his speech on matters of public concern and his participation in the vote of no confidence.  See id.; Stanley, 219 F.3d at 1294.

### B. Qualified Immunity

In cursory fashion, Defendants argue that they are entitled to qualified immunity for their discretionary functions because their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  (Doc. 79 at 21.)  In support of this contention, Defendants simply reiterate the arguments above,

namely that they did not know of Plaintiff's protected activities and that there is no causation. (Id. at 22.)  Entitlement to qualified immunity by officials sued in their individual capacities for performing discretionary functions is based on two inquiries.  "First, the court must ask whether the plaintiff's allegations, if true, establish the violation of a constitutional or statutory right."  Bogle v. McClure, 332 F.3d 1347, 1355 (11th Cir. 2003).  Second, "[i]f a constitutional or statutory right would have been violated under the plaintiff's version of the facts, the next step is to ask whether the right was clearly established."  Id.

A genuine issue of material fact remains as to whether a violation of Plaintiff's constitutional rights occurred, thus, the Court must determine whether such rights were clearly established if they were violated.  "The law is clearly established that a public employer may not retaliate against an employee for an employee's exercise of constitutionally protected speech."  Cook, 414 F.3d at 1318.  The law is equally established that public employees have a First Amendment right to engage in associative activity, including labor union activity, without retaliation.  Id. at 1320.  "If a genuine issue of material fact exists regarding whether the employer was motivated by retaliatory animus when it took the alleged adverse employment action, qualified immunity is appropriate only if the evidence undisputably indicates that the employer was motivated, at least in part, by objectively valid reasons."  Tatroe, 2006 WL 559437, at *15.  Defendants cannot establish beyond dispute that they were motivated by legitimate reasons in pursuing Plaintiff's termination.  If Plaintiff was terminated because of his protected activities and if the justifications offered are pretexual, Defendants would not be entitled to qualified immunity because clearly established law dictates that termination on that basis is impermissible.

C. County Liability[15]

To reach Volusia County, Plaintiff must show that a government custom or policy was behind the allegedly unconstitutional action or that the action was initiated by a policymaker. The County may be liable where "the actions complained of were taken . . . or caused by an official whose actions represent official policy." Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000).  Respondeat superior will not do.  Id. at 56; Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  Whether officials qualify as policymakers is a question of law to be determined by the Court.  "[T]he official . . . need not be a municipal policymaker for all purposes.  Rather, with respect to the conduct challenged, he must be 'responsible under state law for making policy in that area of the [municipality's] business.'" Jeffes, 208 F.3d at 57 (quoting St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988)).  "Thus, the court must 'ask whether [the] governmental official is a final policymaker for the local government in a particular area, or on the particular issue' involved in the action." Id. (quoting McMillian v. Monroe County, 520 U.S. 781, 785 (1997)) (bracketing omitted).

Defendants do not claim that they lacked the initial policymaking authority to terminate Plaintiff or that their decision could have been overruled by a personnel board. Defendants' only argument with respect to the propriety of imposing municipal liability is that the individual Defendants were not the final policymakers because Plaintiff chose "to redress his adverse

---

[15]Defendants conflate the arguments of qualified immunity – which applies to officers sued in their individual capacities – with those pertaining to whether the County can be liable for the officers' actions taken in their official capacities.  The Court separates the two. Although immaterial at this stage, the claims against individual Defendants in their official capacities are redundant of the claim against the government entity the officers represent – Volusia County.

employment action[, which] culminated with an arbitrator rendering a final decision affirming the dismissal on the ground that he presented no triable issues of fact." (Doc. 79 at 22-23.) That is, Defendants argue that the administrative review available to Plaintiff essentially usurped the finality of their policymaking authority.

Although there is support for the principle that an official does not have policymaking authority if his decisions are subjected to meaningful administrative review, see Scala v. City of Winter Park, 116 F.3d 1396, 1398 (11th Cir. 1997); Morro v. City of Birmingham, 117 F.3d 508, 514 (11th Cir. 1997), the Court cannot conclude as a matter of law that Plaintiff's termination was subjected to such review or that the review available here shields the municipality from liability. Contrary to Defendants' representation, the arbitrator did not affirm Plaintiff's dismissal – he dismissed Plaintiff's arbitration claim because his grievance was deficient. The merits of his claim were not reviewed. Defendants have offered no other evidence apart from the suggestion that the decision to terminate Plaintiff could have been reviewed by the County Manager if Plaintiff had chosen to appeal his dismissal to the personnel board. Such speculation cannot support entry of summary judgment. Defendants have failed to show that there is no disputed issue as to whether the individual Defendants were officials whose actions represent official policy and have failed to establish that they are entitled to judgment as a matter of law on this ground.

## IV. Conclusion

In accordance with the foregoing, Defendants' Motion for Summary Judgment (Doc.

79) is **DENIED**.

     **DONE** and **ORDERED** in Chambers, Orlando, Florida this 11th day of March, 2008.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party